## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHER DIVISION

| | | |
|---|---|---|
| **AMERIPRISE FINANCIAL SERVICES, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION NO.** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MITCHELL R. MCCANN,** | ) | |
| **WESLEY MCCANN, and** | ) | |
| **LPL FINANCIAL, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## COMPLAINT

Plaintiff, Ameriprise Financial Services, LLC ("Ameriprise"), files this Complaint and Application for Temporary Restraining Order and Injunctive Relief against Defendants, Mitchell R. McCann ("Mitchell"), Wesley McCann ("Wesley"), and LPL Financial, LLC ("LPL") (collectively "Defendants"):

### Preliminary Statement

1. This action is for a temporary restraining order and a preliminary injunction to maintain the status quo pending resolution of an arbitration proceeding between Ameriprise and Defendants that is currently filed with FINRA Dispute Resolution.[1]

---

[1] The Financial Industry Regulatory Authority ("FINRA") was created in 2007 through the consolidation of the National Association of Securities Dealers, Inc. and

2.     This dispute arises out of Mitchell's and Wesley's resignations from Ameriprise on April 22, 2024, and the immediate commencement of their employment with LPL, a direct competitor of Ameriprise. At the time of their resignation, Mitchell and Wesley worked as a father/son team in Bloomfield Hills, Michigan.

3.     Mitchell's and Wesley's pre- and post-termination behavior has been rife with misconduct and transgressions, supported, and encouraged by LPL. Specifically, Mitchell and Wesley violated—and continue to violate—the Protocol, their contractual agreements with Ameriprise, and common and statutory law through their impermissible taking of confidential information related to, and solicitation of, their former clients.

4.     The Broker Protocol ("Protocol") governs the use of client information when registered representatives move between firms that are signatories to the Protocol.

---

the member regulation, enforcement, and arbitration functions of the New York Stock Exchange. Ameriprise has the express right to seek temporary injunctive relief before a court of competent jurisdiction pending the outcome of arbitration before a full panel by duly-appointed arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes. Pursuant to Rule 13804(2), Ameriprise, at the same time of the filing for a temporary injunctive order from this Court, filed an amended statement of claim requesting permanent injunctive relief. A true and correct copy of Rule 13804 is attached hereto as **Exhibit A**.

5.      Prior to resigning from Ameriprise, Mitchell and Wesley preemptively violated the Protocol, their duties of loyalty to Ameriprise, and their agreements, by pre-announcing their future transition to clients, pre-soliciting clients, and taking confidential documents and information ahead of their resignation.

6.      Leading up to their resignation on April 22, 2024, Mitchell and Wesley conducted an irregular number of print jobs and printed a total of 687 pages of documents containing specific letterhead and confidential information such as client information, names, account numbers, and routing numbers.

7.      In addition to the large number of print jobs of confidential information and documents, Mitchell and Wesley also sent themselves 14 separate emails containing confidential information and confidential documents with client information, names, email addresses, phone numbers, home addresses, account numbers, and routing numbers.

8.      In the days leading up their resignation, in the dark of night, after business hours, and on weekends, Mitchell and Wesley took boxes of confidential documents and information out of Ameriprise to misappropriate the material both before and after their transition to LPL.

9.      Using the confidential information and documents taken, Mitchell and Wesley sent out mass mailing letters to their clients. These letters contained confidential client information and un-redacted information such as social security

3

numbers. These letters were sent out prior to Mitchell's and Wesley's resignation on April 22, 2024. Clients received these letters on April 15, 2024, seven days prior to Mitchell's and Wesley's resignations from Ameriprise.

10.   Ameriprise did not become aware of these violations until after Mitchell's and Wesley's resignations. On May 9, 2024, Ameriprise received a formal written complaint from a customer about receiving copies of their confidential information and un-redacted social security number from Mitchell and Wesley. When the customer spoke with Mitchell and questioned why she was receiving this personal information, Mitchell stated he had all this confidential information for all the clients and all the clients were sent the same exact materials.

11.   While Mitchell and Wesley claimed the protections of the Protocol, they had already violated the Protocol by pre-soliciting clients and mailing out documents to clients with their confidential information prior to their departure and by taking confidential documents and information, rendering the protections of the protocol moot.

12.   In addition to their initial violations and despite Mitchell's and Wesley's contractual obligations to Ameriprise, upon their transition to LPL, Mitchell and Wesley failed to return and improperly retained confidential documents and information belonging to Ameriprise which they printed, sent to themselves, and

took in the dark of night prior to their resignation and misappropriated same to solicit their former clients.

13.     Mitchell's and Wesley's failure to return and retention of documents containing information outside what is allowed by the Protocol—even without use of same—is a violation of the Protocol. Because Mitchell and Wesley violated the Protocol, their transitions are not eligible to receive the protections of the Protocol, and Mitchell and Wesley are not entitled to keep and use their Protocol Lists, as they have done.

14.     An advisor's violation of the Protocol forfeits the protections of the Protocol entirely. **Therefore, Mitchell and Wesley are not able to claim the Protocol protects them in any respect**. Accordingly, the terms of Mitchell's and Wesley's agreements with Ameriprise, *which prohibit the taking of any confidential information and the solicitation of any client*, apply to Mitchell's and Wesley's transitions to LPL.

15.     Mitchell and Wesley have openly acted in plain violation of these contractual agreements. Moreover, Mitchell and Wesley are engaging in such misconduct with the knowledge and support of LPL, whose regular pattern and practice is to encourage recruits to violate their contractual agreements.

16.     Mitchell's and Wesley's conduct constitutes multiple and separate violations of the Protocol, their contractual obligations with Ameriprise, FINRA's requirement for integrity and truthfulness, and both common and statutory law.

17.     To prevent continued irreparable harm arising from Defendants' course of misconduct, Ameriprise seeks immediate injunctive relief (in the form of a temporary restraining order, preliminary injunction, and expedited discover) barring Defendants from soliciting Ameriprise clients, and barring Defendants from further using and compelling the return of Ameriprise's confidential and proprietary business and client information they improperly took, pending resolution of Ameriprise's claims against Defendants in a related arbitration that Ameriprise commenced.

## Jurisdiction and Venue

18.     The Court has jurisdiction in this action pursuant to 28 U.S.C. § 1332(a) in that, as alleged below, Plaintiff Ameriprise, on the one hand, and Defendants, on the other hand, are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and therefore complete diversity exists. Further, Federal Question jurisdiction also exists under 28 U.S.C. § 1331 as Plaintiff's claims include a claim under 18 U.S.C. §1839(6).

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the event giving rise to the claims occurred in Bloomfield Hills, Michigan.

## The Parties

20.     Ameriprise is a is a broker-dealer, registered as such with the United States Securities and Exchange Commission and a member of the Financial Industry Regulatory Authority ("FINRA") and is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota.

21.     Defendant Mitchell R. McCann (CRD #1790141) was a Registered Representative with Ameriprise. Mitchell's CRD is attached as **Exhibit B**. Mitchell was at all times relevant to this dispute, an Associated Person of FINRA. Mitchell is now affiliated with Defendant LPL. Mitchell was employed and/or conducted business in Bloomfield Hills, Michigan and is and was a citizen of Michigan.

22.     Defendant Wesley McCann (CRD #7000302) was a Registered Representative with Ameriprise. Wesley's CRD is attached as **Exhibit C**. Wesley was at all times relevant to this dispute, an Associated Person of FINRA. Wesley is now affiliated with Defendant LPL. Wesley was employed and/or conducted business in Bloomfield Hills, Michigan and is and was a citizen of Michigan.

23.     Defendant LPL (CRD #6413) is a broker-dealer, registered as such with the United States Securities and Exchange Commission and a Member Firm of the

Financial Industry Regulatory Authority ("FINRA") and is a California limited liability company with its principal place of business in San Diego, California. LPL is a necessary party to this action.

24.     In connection with their status as registered representatives of Ameriprise, Mitchell and Wesley executed Forms U-4 Uniform Applications for Securities Industry Registration or Transfers. By executing Forms U-4, Mitchell and Wesley agreed to submit to arbitration disputes, claims, and controversies arising between themselves and Ameriprise.

**Factual Allegations**

I.     **Mitchell's and Wesley's Employment and Contractual Agreements with Ameriprise**

25.     Mitchell joined Ameriprise in 2014. Mitchell executed multiple agreements over the years of their affiliation. Relevant to this dispute, the Financial Advisor Agreement (the "Financial Advisor Agreement") Mitchell signed in 2014 that controls in this matter is attached as **Exhibit D**.

26.     Wesley Joined Ameriprise in 2018. Wesley executed multiple agreements over the years of their affiliation. Relevant to this dispute, the Employment Agreement (the "Employment Agreement") Wesley signed in 2018 that controls in this matter is attached as **Exhibit E**.

27.     Over the course of Mitchell's and Wesley's career, Ameriprise invested heavily in their development and the growth of their business through substantial

coaching, support, investment in top technology, and brand recognition amongst the many other benefits Ameriprise provided.

28.    At Ameriprise, Mitchell had approximately $217 million in assets under management, maintained roughly $1.5 million in T-12, and serviced 169 households. At Ameriprise, Wesley had approximately $32 million in assets under management, maintained roughly $349,000 in T-12, and serviced 53 households.

29.    Mitchell and Wesley have been soliciting clients and sending mass mailings since before April 22, 2024, the day they submitted their letters of resignation. While Mitchell and Wesley are likely to argue that this was permissible conduct because they intended to invoke the Protocol, this assertion is incorrect as Mitchell's and Wesley's invocation of the Protocol was ineffective based on their prior and continuing violations of that same—namely, taking information outside the scope of permissible retention allowed by the Protocol, taking confidential information, and soliciting customers prior to their resignations.

30.    The Protocol clearly states that registered representatives invoking the Protocol are free to solicit customers that they serviced while at their former firms, "**but only after they have joined their new firms**." *See* the Protocol, attached as **Exhibit F**. The Protocol helpfully states that firms, such as Ameriprise in this case, are "free to enforce whatever contractual, statutory or common law restrictions exist

on the solicitation of customers to move their accounts by a departing [registered representative] before he or she has left the firm." *Id.* That is exactly the case here.

31.    Further, the Employment Agreement and the Financial Advisor Agreement contains various restrictive covenants running in favor of Ameriprise, including confidentiality, non-solicitation of clients, and non-solicitation of Ameriprise affiliates/employees.

32.    Regarding confidentiality, Part 6(1) of the Financial Advisor Agreement provides in relevant part that "[a]ll Records and Materials are the property of Company, an Affiliate or one of their associated companies" and requires the immediate return of all such documents upon termination of affiliation, and further prohibits Mitchell from revealing and disclosing same. *See* **Exhibit D**, Financial Advisor Agreement, at Part 6(1)(a-d). The Financial Advisor Agreement also provides that the identities of clients and potential Clients are confidential and "trade secret," and further prohibits Mitchell from using any such information. *See Id.*

33.    Further, Part 6(1)(e)(1-5) of the Financial Advisor Agreement contains multiple restrictions against soliciting and accepting business, stating that for one year after the termination of the Financial Advisor Agreement, Mitchell will not directly or indirectly solicit any client for their business, or even solicit or receive compensation from or related to, any clients that he contacted, serviced, or learned about while operating under the Financial Advisor Agreement. *See Id.* Finally,

10

Mitchell is prohibited from opening accounts for, or receiving compensation for, any clients he serviced or learned about while operating under the Financial Advisor Agreement. *See* **Exhibit D**, Financial Advisor Agreement, at Part 6(1)(e)(1-5).

34.     The Employment Agreement contains extremely similar confidentiality provisions. *See* **Exhibit E**, Employment Agreement, at Part 5(i-iii).

35.     The Employment Agreement and Ameriprise policies also provide extensive examples of what constitutes confidential information, including but not limited to: "Client files, lists, and holding pages, the names, addresses, telephone numbers, and assets and obligations carried in the accounts of Ameriprise's clients, client account histories and client risk profiles, computer software or hardware that is leased or licensed by Ameriprise, training materials made available to Employee during Employee's employment (including but not limited to books, papers, records, videotapes and recordings), documents or computer programs prepared or generated by Employee, Ameriprise's business or marketing plans and strategies, Ameriprise employee and franchisee names, addresses or phone numbers . . ." *See* **Exhibit E** at Part 4.

36.     Additionally, the Employment Agreement and Ameriprise policies provide that, upon termination of the relationship, Mitchell and Wesley were required to return (and not retain) all documents and information to Ameriprise.

Mitchell and Wesley simultaneously agreed that all such records are the property of Ameriprise:

> Employee also agrees that: (a) Employee's use of Protected information will stop immediately upon the suspension or termination of Employee's employment relationship with Ameriprise; (b) Employee will immediately deliver to Ameriprise at the time of suspension or termination of Employee's employment or at any other time upon Ameriprise's request, any Protected Information in Employee's possession or control; and (c) Employee consents and agrees to immediately permit Ameriprise to inspect, prior to remove, any materials Employee intents to take or has taken frim Ameriprise when Employee's employment with Ameriprise is suspended or terminated.

*See* **Exhibit E** at Part 4.

37.     Mitchell and Wesley did not return any documents to Ameriprise as required and impermissibly retained records.

38.     Ameriprise sent Mitchell and Wesley a Reminder of Obligations letter in an attempt to allow Mitchell and Wesley to remedy the situation. *See* **Exhibit G**.

39.     Mitchell and Wesley had every opportunity to comply with the Protocol. They chose not to.

40.     The Employment Agreement provides that, upon termination of the relationship, Mitchell and Wesley agreed that:

> Employee also agrees that: (a) during the term of Employee employment with Ameriprise; and (b) for the longer of one year after termination of employment or until any and all financial obligations of Employee to Ameriprise are satisfied following termination of Employee's employment for an reason, Employee will not, directly or indirectly, recruit or solicit any employee or franchisee advisor, or

prospective employee or prospective franchisee advisor of Ameriprise.
. .

*See* **Exhibit E** at Part 5.

41.    The Protocol also states that advisors invoking the Protocol may only retain, and under certain circumstances, five categories of information: client name, address, phone number, email address, and account title . . . and are prohibited from taking any other documents or information." *Id.* Given that Mitchell and Wesley returned no documents or information, are seen carrying out boxes of documents and papers, and there is documented proof that Mitchell and Wesley conducted large print jobs, sent themselves via email confidential documents and information, and mailed confidential information and documents to clients, they have obviously violated this requirement of the Protocol. Operating under the incorrect assumption that the Protocol protected them, Mitchell and Wesley rapidly solicited most, if not all, of the clients they formerly serviced while affiliated with Ameriprise.

42.    Because Mitchell and Wesley did not follow the Protocol, they cannot have invoked its protections and are therefore, along with LPL, open to "monetary or other liability." *Id.*

## II.     Mitchell and Wesley Improperly Retain Confidential Ameriprise Documents and Information and Solicit Ameriprise Clients

### Taking Boxes of Confidential Documents

43.     In the dark of night, after business hours, and on weekends, Mitchell and Wesley began taking boxes of confidential documents and information out of Ameriprise to misappropriate the material both before and after their transition to LPL.

44.     Ameriprise has photographic proof of Mitchell using his access card to enter his office on Monday, April 1, 2024, at 7:44pm carrying out boxes with unidentifiable documents and papers. *See* **Exhibit H**.

45.     Ameriprise has photographic proof of Mitchell using his access card to enter his office on Thursday, April 4, 2024, at 7:24pm carrying out a stack of unidentifiable documents and papers. *See* **Exhibit H**.

46.     Ameriprise has photographic proof of Wesley using his access card to enter his office on Tuesday, April 9, 2024, at 5:23pm carrying out boxes with unidentifiable documents and papers. *See* **Exhibit H**.

47.     Ameriprise has photographic proof of Mitchell using his access card to enter his office on Friday, April 19, 2024, between 7:34pm and 8:16pm carrying out boxes with unidentifiable documents and papers. *See* **Exhibit H**.

48.     Ameriprise has photographic proof of Mitchell and former Ameriprise employee Nicole Obarto using his access card to enter his office the next day, on

Saturday, April 20, 2024, between 10:03am and 10:20am, again, carrying out boxes with unidentifiable documents and papers. *See* **Exhibit H**.

49.    Ameriprise has photographic proof of Wesley using his access card to enter his office the day after Mitchell, on Sunday, April 21, 2024, between 10:20am and 12:59pm, carrying out boxes with unidentifiable documents and papers. *See* **Exhibit H**.

50.    This is highly suspicious activity from Mitchell and Wesley as both have hardly ever come to the office after hours and/or on weekends. Mitchell predominantly worked from home and Wesley worked three days a week in the office. Mitchell's and Wesley's suspicious activity of entering the office, coupled with the photographic proof of Mitchell and Wesley cleaning out their offices and taking boxes with an abundance of unidentifiable documents further supports Ameriprise's assertion that Mitchell and Wesley took and utilized confidential information in violation of the Protocol and their agreements with Ameriprise.

**<u>Forensic Investigation Examination Report</u>**

51.    A Forensic Investigation Examination Report ("Report") was prepared on May 10, 2024 by Jennifer Swihart ("Jennifer"), Senior Investigator for Ameriprise. *See* **Exhibit I.**

52.    Jennifer received three pieces of evidence; Mitchell's computer, Wesley's computer, and Nicole Obarto's computer. Jennifer conducted the

following reviews on all the computers: box activity history, printer history, OneDrive access history, browser history, emails for the preceding thirty days, data loss prevention ("DLP") alerts, and general computer history. Other than the email review, which covered only the prior thirty days, all other searches were conducted up to ninety days prior to the Mitchell's and Wesley's resignations from Ameriprise.

**Completing Large Print Jobs of Confidential Documents**

53.    Ameriprise's print logs show Mitchell and Wesley conducting multiple large print jobs prior to their resignation on April 22, 2024.

54.    On April 5, 2024, Wesley printed 55 pages of client viewer information. *See* **Exhibit I.**

55.    On April 8, 2024, Wesley printed a client list of primary household members that contained primary member name and spouse name. *See* **Exhibit I.**

56.    On April 8, 2024, Wesley printed 152 pages of client viewer information. *See* **Exhibit I.**

57.    On April 9, 2024, Wesley printed 151 pages of electronic letterhead paper for Wesley. *See* **Exhibit I.**

58.    On April 11, 2024, Mitchell completed 6 different print jobs containing 6 pages of mixed client information and other documents. *See* **Exhibit I.**

59.    On April 12, 2024, Wesley printed another 35 pages of electronic letterhead paper for Wesley. *See* **Exhibit I.**

60.    On April 12, 2024, Mitchell completed 19 different print jobs containing 38 pages of mixed client information and other documents. *See* **Exhibit I.**

61.    On April 15, 2024, Mitchell printed an excel spreadsheet titled, "Banks on File," and in it, contained names, account types, trun. account bank, account numbers, routing number, bank names, account owners, active dates, eligibility, and status. *See* **Exhibit I.**

62.    On April 15, 2024, Mitchell printed an excel spreadsheet titled, "W4R and STATE," and it in, contained names, account numbers, registrations, plan types, instruction types, federal w/h, state codes, option choices, start dates, close dates, and status. *See* **Exhibit I.**

63.    On April 15, 2024, Mitchell completed 27 different print jobs containing 111 pages of mixed client information and other documents. *See* **Exhibit I.**

64.    On April 19, 2024, Mitchell completed 46 different print jobs containing 136 pages of mixed client information and other documents. *See* **Exhibit I.**

65.    This activity was done in order to unfairly compete with Ameriprise and allow Mitchell and Wesley to gain an unfair competitive edge. Within a two-week period between April 5, 2024 and April 19, 2024, Mitchell and Wesley printed

a total of 687 pages of documents containing confidential information such as client information, names, account numbers, routing numbers, client ages, client ID numbers, account values, securities values, positions held, among others, and also printed 186 pages of specific letterhead, which they used to send correspondences to a vast majority of their clients prior to resigning. A copy of the letterhead sent to clients is attached as **Exhibit J**.

**Emailing Themselves Confidential Documents**

66.    Ameriprise's email logs show Mitchell and Wesley sending themselves multiple emails to their personal email accounts prior to their resignation on April 22, 2024.

67.    On April 7, 2024, Mitchell emailed himself something with the description, "email to be sent to clients from personal email account to AMPF account." *See* **Exhibit I.**

68.    On April 7, 2024, Mitchell emailed himself a document titled, "why letter to AOL account." *See* **Exhibit I.**

69.    On April 9, 2024, Mitchell emailed himself a document titled, "Chat GBT – why letter 2 to AOL account." *See* **Exhibit I.**

70.    On April 15, 2024, Wesley emailed himself a spreadsheet titled, "untitled – for wes dubs" and it contained 412 individuals and contained names, addresses, email addresses, and phone numbers. *See* **Exhibit I.**

71.     On April 15, 2024, Wesley emailed himself a spreadsheet titled, "2nd – for wes dubs" and it contained 412 individuals and contained names, addresses, email addresses, and phone numbers. *See* **Exhibit I.**

72.     On April 15, 2024, Wesley emailed himself a spreadsheet titled, "untitled prospects" and it contained 5,202 individuals and contained campaign names, names, owners, status, emails, and phone numbers. *See* **Exhibit I.**

73.     On April 18, 2024, Wesley emailed himself a spreadsheet titled, "prospects" and it contained 5,202 individuals and contained campaign names, names, owners, status, emails, and phone numbers. *See* **Exhibit I.**

74.     On April 18, 2024, Wesley emailed himself a spreadsheet titled, "prospects" and it contained 5,202 individuals and contained campaign names, names, owners, status, emails, and phone numbers. *See* **Exhibit I.**

75.     On April 18, 2024, Wesley emailed himself documents titled, "untitled – 22 attachments" and it contained 20 individuals and contained 22 attachments regarding income plans, dividend growth, etc. *See* **Exhibit I.**

76.     On April 18, 2024, Wesley emailed himself documents titled, "untitled – 9 attachments" and it contained 9 individuals and contained 9 attachments regarding 5-year plans, income plans, and dividend growth reports. *See* **Exhibit I.**

77.     On April 18, 2024, Wesley emailed himself documents titled, "untitled – 8 attachments" and it contained 8 individuals and contained 8 attachments regarding 5-year plans, income plans, and dividend growth reports. *See* **Exhibit I.**

78.     On April 18, 2024, Wesley emailed himself documents titled, "untitled – 14 attachments" and it contained 14 individuals and contained 14 attachments regarding 5-year plans, income plans, and dividend growth reports. *See* **Exhibit I.**

79.     On April 20, 2024, Wesley emailed himself a spreadsheet titled, "untitled – copy for me" and it contained names, addresses, email addresses, and phone numbers. *See* **Exhibit I.**

80.     On April 21, 2024, Wesley emailed himself a spreadsheet titled, "CA" and it contained 715 individuals and contained client names, account types, plan types, ownership, status, group IDs, and servicing advisor. *See* **Exhibit I.**

81.     Again, this activity was done in order to unfairly compete with Ameriprise and allow Mitchell and Wesley to gain an unfair competitive edge. Within a two week period between April 7, 2024 and April 21, 2024, Mitchell and Wesley sent themselves 14 separate emails from their Ameriprise email addresses to their personal email addresses containing confidential information and confidential documents with client information, names, email addresses, phone numbers, home addresses, account numbers, and routing numbers for over 6,000 customers and prospects. The emails Mitchell and Wesley sent to themselves

contained over fifty attached documents which included client lists, draft letters to be sent to clients soliciting those same clients to move their business to LPL, various clients' Dividend Report Cards, Income Retirement Plans, 5-Year Game Plans, prospect lists, strategy documents developed while at Ameriprise, among many others.

**Creation of New Website**

82.     When investigating Mitchell's and Wesley's browser history, Jennifer discovered that Mitchell and Wesley registered a new website for their team, Guardian Partner Wealth Management while still employed at Ameriprise.

83.     Mitchell and Wesley completed their competing website by using Ameriprise devices ahead of their resignation.

**Mass Mailing to Clients and Retention of Confidential Documents and Information**

84.     Ameriprise received a written complaint from a customer on May 9, 2024. In the complaint, the customer states they received documents and mail from Mitchell and Wesley on April 15, 2024, seven days prior to their resignation from Ameriprise. *See* **Exhibit K.**

85.     In it, the complaint stated that the customer received an envelope and, "inside the envelope was a printout of investment value . . . a printed screenshot showing full name, date of birth, age FULL Social Security Number, phone number, email, and home address." The client also indicated that they called Mitchell to

discuss this breach of her family's privacy, and stated that Mitchell acted "unbothered" and said that he "mail[ed] that out to all their clients." The client was very upset and inquired into the sufficiency of Ameriprise's privacy policies.

86.    Based on (1) the photographic evidence that shows Mitchell and Wesley carrying out boxes of confidential documents and information after hours, in the night, and on the weekend prior to their resignation; (2) the evidence that Mitchell and Wesley printed a total of 687 pages of documents containing specific letterhead and confidential information such as client information, names, account numbers, and routing numbers; and (3) the evidence that Mitchell and Wesley sent themselves 14 emails containing confidential information and confidential documents with client information, names, email addresses, phone numbers, home addresses, account numbers, and routing numbers, and the customer complaint, it is clear that Mitchell and Wesley sent mass letters to a vast majority of their clients with confidential client information prior to their resignation from Ameriprise on April 22, 2024.

87.    Mitchell and Wesley accessed and printed out 207 pages of client information documents from Ameriprise's Client Viewer ("Client Viewer") and 186 copies of their personal letterhead prior to April 15, 2024, the date the complaining customer stated her family received the information from Mitchell. *See* **Exhibit K.** Based on this information, and the client's indications in her complaint, it is clear

that Mitchell and Wesley likely sent letters to a vast majority of their clients containing Ameriprise confidential information prior to their resignation on April 22, 2024.

88.     Client Viewer is the client record system that Ameriprise uses to organize and store client data. Client Viewer contains the following four main categories of information; account assets view, schedule transfer view, bank instruction view, and account profile view. Within each category, there are several subcategories of extremely  sensitive information: client name, account number, client age, client ID, case value, account value, securities value, positions held, routing number, account number, ownership of account, bank name, account type, scheduled bank transfers, direct deposits, amounts of same, account numbers, ownership of the account, age of owner, open date of account, cash value of account, routing and corresponding account numbers for related checking accounts, address for account owner, client ID numbers, and plan types.

89.     Comparing the information cited in the client's complaint to Mitchell's and Wesley's printer history, it is clear that the print jobs and computer activity on Client Viewer immediately prior to resignation directly align with what this customer and, according to the complaining client via Mitchell's responses, many other customers received. It is clear that Mitchell and Wesley retained and used

Ameriprise's confidential information to send mass mailing letters to their clients prior to their resignation in order to pre-solicit their clients.

90.    By doing this, Mitchell and Wesley are in clear violation of the Protocol, their agreements with Ameriprise, and the Defend Trade Secrets Act 18 U.S.C. §1839(6) and Section 445.1902(a) of the Michigan Uniform Trade Secrets Act.

91.    Upon their resignations, Mitchell and Wesley improperly retained, used, and disclosed a significant volume of confidential documents and information belonging to Ameriprise in violation of their various agreements, as stated above. This includes, for example, documents such as account statements, account opening documents, client portfolio reviews, financial plans, account workbooks, account statements, proprietary Ameriprise information and modeling, and confidential client information such as account number(s), account balance(s), investment goal(s), birthday, and/or social security number, among other highly confidential documents and information (Collectively, the "Confidential Materials").

92.    Without such Confidential Materials taken prior to their resignation, Mitchell and Wesley would have been unable to commence calling and soliciting Ameriprise clients immediately upon their resignations from Ameriprise or prior to their resignations.

93.    The Confidential Materials are generally not publicly available, not approved for any external distribution, and is intended for internal use only.

94.    Ameriprise began receiving completed ACAT forms in the mail from multiple customers only two days after Mitchell's and Wesley's resignations. Based on the print log and email log evidence and the customer complaint, this further shows that Mitchell and Wesley mailed documents to their clients containing confidential information, including account numbers, which cannot be taken pursuant to the Protocol, and sought client signatures in order to quickly transfer the accounts to LPL. This can only be possible by using misappropriated Ameriprise Confidential Materials. There is no way this could have occurred so swiftly via mail two days after resigning. Given the evidence of Mitchell and Wesley completing large print jobs in the weeks leading to their resignation, emailing themselves confidential documents and information in the weeks leading to their resignation, and carrying out boxes of confidential documents in the dark of night, it is clear that Mitchell and Wesley improperly retained confidential information in violation of their agreements and in violation of the Protocol.

95.    Mitchell's and Wesley's retention and use of the Confidential Materials, as well as their disclosure of same to LPL, and their solicitation of Ameriprise clients is ongoing.

96.    Ameriprise located a significant amount of documents containing confidential client information and Ameriprise trade secrets that Mitchell and Wesley put in the shred bin but were not yet shredded. Another document found in the shred bin, was Mitchell's and Wesley's LPL deal document. *See* **Exhibit L**. Under the Protocol, there is no reason to attempt to shred and hide these documents. One can only conclude that Mitchell and Wesley impermissibly utilized these documents to retain confidential client information.

97.    In the event Mitchell and Wesley actually shredded Confidential Materials and documents, they have further violated their agreements with Ameriprise, resulting in Ameriprise not being able to service its own clients because their documents have been impermissibly destroyed. In the event Mitchell and Wesley did not shred the Confidential Materials and documents, the only conclusion is that they still possess them and are continuing to use them, also resulting in damage to Ameriprise.

98.    Mitchell and Wesley also solicited former Ameriprise employee Nicole Obarto to terminate her relationship with Ameriprise and join LPL. This is in direct violation of the Protocol and in violation of Mitchell's and Wesley's agreements with Ameriprise.

99.    Ameriprise invests substantial time and money, totaling millions of dollars, to acquire, develop, and maintain its clients. It is with great difficulty, and

only after a great expenditure of time, money and effort, that Ameriprise acquired its existing clients. Ameriprise spends substantial resources in gaining knowledge about its clients and protecting the privacy of such information. Defendants jeopardized this process. The component of trust is highly important to the relationship between an advisor and their clients. By improperly soliciting these clients, Mitchell and Wesley tarnished the trust and good will Ameriprise expended a great amount of time and money to attain.

100.    Ameriprise employs reasonable efforts to maintain its confidential and proprietary information, including, but not limited to, its client records. Specifically, access to the records is restricted to those employees and/or affiliates whose jobs require them to refer to this information. Ameriprise prohibits duplication of the records, requires employees and affiliates to use a secure password to access their computer terminals and the firm's intranet, and constantly provides reminders about the confidential nature of the information contained in the records and the need to protect it. Employees and affiliates such as Mitchell and Wesley are repeatedly made aware, and know, that they must maintain the strictly confidentiality of the client information. These obligations are confirmed in, among other things, the agreements referenced above.

101.    The confidential information that Mitchell and Wesley retained and provided to LPL was entrusted to Ameriprise by its clients with the expectation that

27

it would remain confidential and would not be disclosed to third-parties or used for any third-parties' benefit.

102.   Furthermore, FINRA Rules, the Gramm-Leach-Bliley Act ("GLBA"), and Regulation S-P mandate the confidentiality of client information. The Protocol permits advisors to take only very limited information to avoid violations of these rules and regulations. Ameriprise must pursue evident breaches of these rules and regulations as failure to do so would erode client confidence in the firm to protect such information. Indeed, by law, Ameriprise must safeguard this information until the controlling authorities authorize its release. Mitchell and Wesley had access to this information solely by virtue of their affiliations with Ameriprise.

103.   For its part, Ameriprise took numerous steps to protect the confidentiality of this information. Mitchell and Wesley were fully aware of, and responsible for, complying with Ameriprise's internal policies, which reflect the legal responsibilities of the firm and its advisors regarding confidentiality. Ameriprise implemented numerous other policies and established tight security to ensure the confidentiality of its client information. For example, as is stated above, access to the Ameriprise's computer network by its professionals is password-protected, and Ameriprise limits its client information to certain individuals who need access to such information to perform their job functions.

104.   Mitchell's and Wesley's misconduct, as described above, constitutes at a minimum, breaches of contract, breaches of fiduciary duty and duty of loyalty, tortious interference, conversion, misappropriation and misuse of trade secrets, and unfair competition. Unless Mitchell's and Wesley's conduct is immediately enjoined, Ameriprise's other employees and affiliates would be encouraged to engage in the same improper conduct. This misconduct is highly disruptive to Ameriprise's ability to conduct business in a stable manner and to maintain Ameriprise's goodwill with its clients and employees and affiliates.

105.   FINRA has sanctioned advisors and firms for the exact same conduct that occurred here as it is clearly a violation of FINRA rules.

106.   FINRA enters Letters of Acceptance, Waiver, and Consent ("AWC") against advisors and firms and implements some level of fine and suspension for the above mentioned conduct. This level of sanction from FINRA is appropriate here given the extreme misappropriation of confidential documents and information by Defendants. FINRA considers these actions violations of the Protocol, of FINRA rules, and of existing contracts between financial firms and advisors.

107.   Letter of Acceptance Waiver, and Consent, No. 2012031496901 (Mar. 31, 2015), sanctioned an advisor for taking customer information prior to resignation and sending that same information to customers following resignation without

authorization of their prior firm. *See* **Exhibit M**. This is the exact same conduct Mitchell and Wesley engaged in prior to their resignation from Ameriprise.

108.   This action coupled with the request for a temporary and preliminary injunction is necessary to remedy the situation and prevent Defendants from conducting future business in this manner and using confidential information and documents at Ameriprise's expense.

109.   It appears that LPL has permitted Mitchell and Wesley to retain and use their Ameriprise confidential documents and information in violation of their contracts, applicable law, and the Protocol. Upon information and belief, Ameriprise suspects this could be standard practice for LPL, and will seek documents and information in discovery that will address same.

110.   At best, LPL failed and refused to properly instruct Mitchell and Wesley regarding their obligations pursuant to the Protocol, their contractual agreements with Ameriprise, and the applicable law, rules, and regulations. At worst, LPL encouraged and participated in these violations, upon information and belief, to improve client transition rates for its own pecuniary benefit.

111.   LPL stands to benefit significantly from Mitchell's and Wesley's conduct in the form of, *inter alia*, increased client assets and revenue generation.

112.   Defendants have clearly misappropriated Ameriprise confidential information. The only avenue Ameriprise has to ensure immediate return is through

the Court's power of injunctive relief. Similarly, Ameriprise must immediately investigate other clients affected by this misappropriation and the only way to do so is through expedited discovery. Ameriprise must investigate the mailings and determine the number of clients affected by this misconduct. Based on the information gathered, it is clear that Mitchell and Wesley sent letters to a vast majority of their clients. Ameriprise must determine the exact number of clients in order to retrieve Ameriprise's confidential information.

113.  Defendants' misconduct creates privacy issues and is highly disruptive to Ameriprise's ability conduct business in a stable manner and to maintain Ameriprise's goodwill with its clients. Unless Defendants' misconduct is immediately restrained and enjoined, other competitors of Ameriprise will be encouraged to engage in the same kind of improper behavior with complete impunity, the result of which will inflict sever and permanent damages on Ameriprise.

114.  By improperly soliciting Ameriprise's clients, Defendants have caused and will continue to cause continuing and irreparable injury to Ameriprise which cannot be cured by monetary damages. Defendants' wrongdoing have caused and will continue to inflict irreparable harm to Ameriprise by causing:

   a. Loss of Ameriprise clients and loss of client confidence;

b. Injury to Ameriprise's reputation and goodwill in Michigan;

c. Use and disclosure of Ameriprise's confidential and proprietary information, including client lists;

d. Damage to office morale and stability, and the undermining of office protocols and procedures; and

e. Present economic loss, which is unascertainable at this time, and future economic loss, which is now incalculable.

**FIRST CAUSE OF ACTION**
**(Breach of Contract Against Mitchell and Wesley)**

115.   Ameriprise realleges and incorporates herein by reference the allegations contained in Paragraphs 1-114.

116.   Mitchell and Wesley retained, used, and are presently using Ameriprise's confidential documents and information, and has disclosed such documents and information to LPL.

117.   Mitchell and Wesley are soliciting Ameriprise clients.

118.   Mitchell and Wesley solicited former Ameriprise employee, Nicole Obarto.

119.   Mitchell and Wesley breached, and continue to breach, their contractual duties under the Employee Agreement and Financial Advisor Agreement with Ameriprise, including their duties not to solicit Ameriprise's clients and/or

employees or affiliates both before and after resignation, and not to take, retain, and/or use confidential and proprietary information from Ameriprise.

120.   Ameriprise performed all of its duties under the Employee Agreement and Financial Advisor Agreement.

121.   Ameriprise has been injured and will continue to be injured by Mitchell's and Wesley's breaches in an amount which cannot readily be ascertainable or compensated by money damages.

122.   As a proximate result of Mitchell's and Wesley's breaches, Ameriprise sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated and for which there is no adequate remedy at law. Accordingly, Ameriprise is entitled to injunctive relief and further damages to be determined at final hearing.

## SECOND CAUSE OF ACTION
### (Conversion Against All Defendants)

123.   Ameriprise realleges and incorporates herein by reference the allegations contained in Paragraphs 1-114.

124.   At all times Ameriprise was, and still is, entitled to the immediate and exclusive possession of its confidential and proprietary information and all physical embodiments thereof.

125.   Upon their departures from Ameriprise, Mitchell and Wesley took Ameriprise's confidential and proprietary information, including, but not limited to,

confidential client contact and financial information, account workbooks, and account statements, without Ameriprise's permission or consent, and converted such information for their use and the use of their new firm, LPL, and/or those acting in concert with them.

126.  LPL refuses to return Ameriprise's confidential and proprietary information.

127.  Mitchell and Wesley refuse to return Ameriprise's confidential and proprietary information.

128.  LPL's retention and use of Ameriprise's confidential and proprietary information without Ameriprise's permission and consent constitutes conversion.

129.  As a direct and proximate result of Defendants' conversion, Ameriprise sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated and for which there is no adequate remedy at law. Accordingly, Ameriprise is entitled to injunctive relief and damages to be determined at final hearing.

## THIRD CAUSE OF ACTION
### (Misappropriation of Trade Secrets Against All Defendants)

130.  Ameriprise realleges and incorporates herein by reference the allegations contained in Paragraphs 1-114.

131.  Ameriprise's confidential and proprietary client information, including the information contained on the Protocol Lists, constitutes a "trade secret" within

the definition under 18 U.S.C. §1839(3) and the Michigan Uniform Trade Secrets Act Section 445.

132. By breaching their duties of confidentiality and to otherwise maintain the secrecy of Ameriprise's trade secrets, Mitchell and Wesley acquired Ameriprise's trade secrets by "improper means," as defined in the Defend Trade Secrets Act 18 U.S.C. §1839(6) and under Section 445.1902(a) of the Michigan Uniform Trade Secrets Act.

133. LPL induced Mitchell and Wesley to breach their obligations to maintain secrecy of the trade secrets and acquired the trade secrets from Mitchell and Wesley, despite knowledge that Mitchell and Wesley had employed "improper means" to obtain same.

134. Mitchell and Wesley disclosed or used Ameriprise's trade secrets without Ameriprise's express or implied consent.

135. Mitchell's and Wesley's misappropriation was willful and malicious.

136. Ameriprise is entitled to injunctive relief pursuant to 18 U.S.C. §1836(b)(3)(A) and Section 445.1903 of the Michigan Uniform Trade Secrets Act.

137. In addition, Ameriprise is entitled to an award of damages for the actual loss caused by misappropriation pursuant to 18 U.S.C. §1836(b)(3)(B)(i)(I) and Section 445.1904 of the Michigan Uniform Trade Secrets Act, exemplary damages

pursuant to 18 U.S.C. §1836(b)(3)(C), and attorney's fees pursuant to 18 U.S.C. §1836(b)(3)(D) and Section 445.1905 of the Michigan Uniform Trade Secrets Act.

### FOURTH CAUSE OF ACTION
**(Tortious Interference Against Mitchell and Wesley)**

138.   Ameriprise realleges and incorporates herein by reference the allegations contained in Paragraphs 1-114.

139.   Ameriprise develops and maintains advantageous actual and prospective business relationships and business expectancies with respect to its clients, which promise a continuing probability of future economic benefit to Ameriprise.

140.   Mitchell and Wesley knew or reasonably should have known about Ameriprise's advantageous actual and prospective business relationships and business expectancies with respect to its clients.

141.   Mitchell and Wesley intentionally or negligently interfered with, and continue to interfere with, Ameriprise's business relationships and business expectancies with respect to its clients by, among other things, directly and/or indirectly attempting to induce Ameriprise's clients to sever their relationships with Ameriprise and instead join LPL.

142.   There is no privilege or justification for Mitchell's and Wesley's misconduct. On the contrary, Mitchell and Wesley are interfering with Ameriprise's business relationships and expectancies by improper means and in violation of their

contractual obligations of confidentiality and non-solicitation, in breach of their fiduciary duties of loyalty, and in reliance on the trade secrets that Mitchell and Wesley misappropriated from Ameriprise.

143.  Mitchell's and Wesley's conduct were and continues to be improper, willful, and malicious.

144.  As a direct and proximate result of Mitchell's and Wesley's tortious interference with Ameriprise's actual and prospective business relationships and expectancies, Ameriprise has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated and for which there is no adequate remedy at law. Accordingly, Ameriprise is entitled to injunctive relief and damages to be determined at final hearing.

### FIFTH CAUSE OF ACTION
### (Tortious Interference Against LPL)

145.  Ameriprise realleges and incorporates herein by reference the allegations contained in Paragraphs 1-114.

146.  Ameriprise develops and maintains advantageous actual and prospective business relationships and business expectancies with respect to its employees and affiliates, which promise a continuing probability of future economic benefit to Ameriprise.

147.  The business relationships Ameriprise develops and maintains with its employees and affiliates necessitate restrictive covenants including non-solicitation

and confidentiality obligations, such as those included in the Employee Agreement and Financial Advisor Agreement.

148.  LPL knew or reasonably should have known about Ameriprise's advantageous actual and prospective business relationships and business expectancies with respect to its employees and affiliates, including Mitchell and Wesley.

149.  LPL intentionally or negligently interfered with, and continues to interfere with, Ameriprise's business relationships and business expectancies with respect to its employees and affiliates by, among other things, directly and/or indirectly inducing Ameriprise's employees and affiliates, including Mitchell and Wesley, to sever their relationships with Ameriprise and breach their contractual obligations to Ameriprise.

150.  There is no privilege or justification for LPL's conduct. On the contrary, LPL is interfering with Ameriprise's business relationships and expectancies by improper means and inducing Mitchell and Wesley to violate their contractual and legal obligations to Ameriprise.

151.  As a direct and proximate result of LPL's tortious interference with Ameriprise's actual and prospective business relationships and expectancies, Ameriprise has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated and for which there is no adequate remedy at

law. Accordingly, Ameriprise is entitled to injunctive relief and damages to be determined at final hearing.

## SIXTH CAUSE OF ACTION
### (Unfair Competition Against All Defendants)

152. Ameriprise realleges and incorporates herein by reference the allegations contained in Paragraphs 1-114.

153. Defendants' conduct as set forth above and incorporated herein is unlawful, unfair and deceptive, and it constitutes unfair competition.

154. Defendants were fully aware, or should have been aware, that the misconduct they engaged in would cause Ameriprise to lose clients that it expended great deals of time, effort and money to develop, and who Defendants would not had an opportunity to advise had Mitchell and Wesley not been affiliated with Ameriprise.

155. As a direct and proximate result of Defendants' unfair competition, Ameriprise sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated and for which there is no adequate remedy at law. Accordingly, Ameriprise is entitled to injunctive relief restraining Defendants from engaging in further wrongful conduct and restoring the status quo ante as well as further damages to be decided at final hearing.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment Against All Defendants)

156.   Ameriprise realleges and incorporates herein by reference the allegations contained in Paragraphs 1-114.

157.   Mitchell and Wesley have been unjustly enriched by their access to, use of, and disclosure of Ameriprise's confidential information.

158.   Mitchell and Wesley have been unjustly enriched by their solicitations of previous or current Ameriprise clients and prospects.

159.   Mitchell and Wesley received compensation for every Ameriprise client they solicited or pre-solicited to join LPL.

160.   LPL condones, encourages, and compensates Mitchell and Wesley for their wrongful conduct as LPL, too, receives substantial profit from and is unjustly enriched by each Ameriprise client improperly solicited to join LPL.

161.   Mitchell's and Wesley's solicitations were at, and continues to be at, Ameriprise's expense as Ameriprise is continually damaged by Mitchell's and Wesley's and LPL's actions.

162.   It is highly inequitable for Ameriprise to have its reputation ruined, lose assets, and have valuable assets solicited away and for Mitchell and Wesley and LPL to profit from their wrongful conduct.

## EIGHTH CAUSE OF ACTION
### (Breach of Fiduciary Duties, Including Duty of Loyalty Against Mitchell and Wesley)

163.   Ameriprise realleges and incorporates herein by reference the allegations contained in Paragraphs 1-114.

164.   Mitchell and Wesley violated their duties of loyalty to Ameriprise by pre-announcing their future transition to clients and pre-soliciting clients.

165.   Mitchell and Wesley violated their duties of loyalty to Ameriprise by soliciting each other to leave Ameriprise and join a competitor while all still affiliated with Ameriprise.

166.   Mitchell and Wesley further violated their duties of loyalty to Ameriprise by soliciting Nicole Obarto to leave Ameriprise and join a competitor while all still affiliated with Ameriprise.

167.   As a proximate result of Mitchell's and Wesley's breaches, Ameriprise sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated and for which there is no adequate remedy at law. Accordingly, Ameriprise is entitled to injunctive relief and further damages to be determined at final hearing

**WHEREFORE**, Ameriprise respectfully requests that a judgement be entered in its favor against Defendants as follows:

A.    In support of all claims for relief, a temporary and preliminary injunction lasting until such time as duly appointed panel of arbitrators at FINRA renders an award in the underlying dispute, enjoining and restraining Defendants, directly or indirectly, and whether alone or in concert with others, including but not limited to the directors, officers, employees, and/or agents of LPL from:

    i.    Soliciting, attempting to solicit, inducing to leave or attempting to induce to leave any Ameriprise client services by Defendants at Ameriprise or whose names became known to Defendants by virtue of their employment with Ameriprise (or any of its predecessors in interest); and

    ii.    Using, disclosing, or transmitting for any purpose Ameriprise's documents, materials, and/or confidential and proprietary information pertaining to Ameriprise, Ameriprise's employees, and/or Ameriprise's clients.

B.    Ordering Defendants, and all those acting in concert with them, to return to Ameriprise or its counsel all records, documents, and/or information in whatever form (whether original, copied, computerized, electronically stored, or handwritten) pertaining to Ameriprise's customers, employees, and business within 24 hours of notice to Defendants or their counsel of the terms of such an order.

C.    Expedited discovery.

D.    Such other and further relief as the Court deems just and proper.

[*Signature Page Below*]

Dated: June 4, 2024                    Respectfully submitted,

                                       SHUMAKER, LOOP & KENDRICK, LLP
                                       240 South Pineapple Avenue
                                       Post Office Box 49948
                                       Sarasota, Florida 34230-6948
                                       (941) 366-6660
                                       (941) 366-3999 (fax)
                                       Counsel for Plaintiff

                                       By:  _*s/ Brandon M. Taaffe*__
                                            **Brandon M. Taaffe, Esq.**
                                            MI Bar No. P87342
                                            Fla. Bar No. 118932
                                            **Michael S. Taaffe, Esq.**
                                            Fla. Bar No. 490318
                                            **Justin P. Senior, Esq.**
                                            Fla Bar No. 1004223
                                            **Andrew R. Marsh, Esq.**
                                            Florida Bar No. 1044680